**WEBCO LUMBER, INC.**

v.

**The UNITED STATES.**

**No. 491–79C.**

United States Court of Claims.

May 5, 1982.

Alan I. Saltman, Washington, D. C., atty. of record, for plaintiff. Gary G. Stevens, Saltman & Stevens, P.C., Washington, D. C., of counsel.

Ray Goddard, Washington, D. C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, and KUNZIG * and SMITH, Judges.

## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

FRIEDMAN, Chief Judge:

Once again, we must determine whether the estimates in a government timber-cutting contract of the amounts of recoverable timber constituted a warranty, for the breach of which the contractor may recover where the timber actually removed was substantially less than the estimated amount. The plaintiff seeks damages apparently reflecting the difference between the value of the estimated timber and the timber it removed. The defendant has moved for summary judgment. We hold that the plaintiff is not entitled to recover. We therefore grant the motion and dismiss the petition.

### I.

A. In 1976, the Bureau of Land Management of the Department of the Interior (the "Bureau") issued a "Timber Sale Notice" inviting bids on a timber sale contract (the "timber contract"). The notice stated that "[t]he volumes listed herein are estimates only," and that "[t]he Purchaser shall be liable for the total purchase price, without regard to the amount bid per unit, even though quantity of timber actually cut or removed or designated for taking is more or less than the estimated volume or quantity so listed."

A sales prospectus, apparently issued the same day, estimated that 6,962 MBF of timber were recoverable under the timber contract and that the estimated volume multiplied by the appraised price of the different kinds of trees was $732,143.60. Under the Bureau's regulations this was the minimum acceptable bid. The prospectus

stated that the "timber volume estimates were derived from individual measurement taken during a 100% cruise...." A "cruise" is a method of estimating the amount of recoverable timber. A 100% cruise indicates that each of the trees available for cutting has been examined individually.

A "Deposit and Bid for Timber, Lump Sum Sale" form accompanied the prospectus. This bid form stated, in language similar to that in the notice, that "[i]f timber sale contract is executed, undersigned is liable for total purchase price even though the quantity of timber cut, removed, or designated for taking is more or less than the total estimated volume or quantity shown above." In addition, the "Instructions to Bidders," attached to the bid form, stated:

3. *Inspection of timber*—Bidder is invited, urged and cautioned to inspect the timber prior to submitting a bid. By executing the timber sale contract, bidder warrants that the contract is accepted on the basis of his examination and inspection of the timber and his opinion of its value.

4. *Disclaimer of warranty*—Government expressly disclaims any warranty of the fitness of the timber for any purpose of the bidder; all timber is to be sold "As is" without any warranty of merchantability by the Government. Any warranty as to the quantity or quality of timber to be sold is expressly disclaimed by Government.

   *    *    *    *    *    *

6. *Bid forms ...*

(a) *Lump sum sales*—Bids shall specify (1) Bureau of Land Management estimated volume, (2) price per thousand board feet, and (3) total purchase price. Estimated volume and price per thousand board feet are to be used for administrative and reappraisal purposes only. Upon award of contract, high bidder shall be

* Prior to his death, Judge Kunzig participated in the oral argument and agreed to the disposition of this case.

liable for total purchase price, including any adjustment which may be made as a result of reappraisal if any extension of time is granted, even though quantity of timber actually cut, removed, or designated for taking is more or less than the estimated volume or quantity listed.

B. Prior to submitting its bid, the plaintiff sent two employees on a two-day walk-through of the timber area; the plaintiff, however, did not conduct its own cruise. The plaintiff states that it based its bid on the government's estimate of the recoverable volume of timber. It submitted a written bid on the government-supplied bid form (see above) equal to the minimum bid, *i.e.*, $732,143.60, indicated in the prospectus.

Three other bidders also submitted the minimum bid. In accordance with the regulations, the four bidders participated in an oral auction. The plaintiff obtained the contract for $745,131.70.

The plaintiff and the Bureau then executed a "Contract for the Sale of Timber: Lump Sum Sale." The body of the timber contract does not include an estimate of the amount of timber sold. Rather, section 1 of the timber contract describes the timber sold as all timber on designated tracts of government land "except that reserved to the Government under Sec. 40 of this contract." Section 40, in turn, reserves all timber except "approximately eight thousand, one hundred and twenty (8,120) trees" marked in blue paint by the government.

Exhibit B of the timber contract contains "estimates" of the volume of timber sold. The estimates are identical to those in the prospectus. Exhibit B states in part:

The following estimates and calculations of value of timber sold are made solely as an administrative aid for determining: (1) adjustments made or credits given in accordance with Secs. 6, 9, or 11; (2) when payments are due; and (3) value of timber subject to any special bonding provisions. Except as provided in Sec. 2 [irrelevant in the present case], Purchaser shall be liable for total purchase price even though quantity of timber actually cut or removed or designated for taking

is less than the estimated volume or quantity shown.

Section 6 of the timber contract, which is on the first page, is entitled "Inspection of Timber and Disclaimer of Warranty." It states in pertinent part:

(a) Purchaser warrants that this contract is accepted and executed on the basis of its examination and inspection of the timber sold under this contract and its opinion of the value thereof.

(b) Government expressly disclaims any warranty of fitness of the timber for any purpose, all timber sold hereunder is accepted *As is* without any warranty or merchantability by Government. Any warranty as to the quantity or quality of the timber sold hereunder is expressly disclaimed by the Government. . . .

During the cutting of the timber, the plaintiff and defendant agreed to several modifications of the timber contract. As a result, the total purchase price was increased to $762,117.50.

In September 1978, the plaintiff completed its logging operations. It determined that the amount of timber recovered was approximately 31 percent less than the estimate in the prospectus and Exhibit B of the timber contract.

In the present suit, the plaintiff contends that the discrepancy between the estimated amount of timber and the amount recovered resulted from the negligence of the Bureau employees who conducted the cruise, that the plaintiff relied upon these estimates in preparing its bid in the belief that they were accurate, and that the estimates "constituted a misrepresentation of the actual volume on sale." The plaintiff seeks damages of $76,816.75, plus interest.

II.

A. "[A] warranty is an assurance by one party to an agreement of the existence of a fact upon which the other party may rely; it is intended precisely to relieve the promisee of any duty to ascertain the facts for himself. Thus, a warranty amounts to a promise to indemnify the

promisee for any loss if the fact warranted proves untrue." *Dale Construction Co. v. United States*, 168 Ct.Cl. 692, 699 (1964). The government's estimates of the amount of recoverable timber under this contract were not warranties. They merely were estimates, and the government unequivocally disclaimed making any warranties. The plaintiff therefore fails in its claim that the alleged discrepancy between the estimates and the timber the plaintiff removed reflected a breach of warranty by the government.

All the government's figures were described as "estimates." They appeared not in the body of the contract but in an exhibit to it. The exhibit stated that the "estimates" were "made solely as an administrative aid for determining" (1) adjustments in the contract (under provisions of the timber contract not relevant here), (2) the timing of the plaintiff's payments under the contract, and (3) the value of timber subject to bonding. The exhibit further stated that the purchasers "shall be liable for total purchase price even though quantity of timber actually cut or removed or designated for taking is less than the estimated volume or quantity shown." Virtually the same language also appeared in the notice of the timber sale contract (*supra* p. 861) and in the bid form.

Section 6(a) of the contract, on its first page, stated: "Purchaser warrants that this contract is accepted and executed on the basis of its examinations and inspections of the timber sold under this contract and its opinion of the value thereof." The instructions to bidders that accompanied the bid form similarly stated that "by executing the timber sale contract, bidder warrants that the contract is accepted on the basis of his examination and inspection of the timber and his opinion of its value." In addition to these numerous and specific instructions to the bidders that they were not to treat the estimates as anything other than estimates, the government twice explicitly disclaimed that it was making any warranties. Article 6 of the contract, captioned "Inspection of Timber and Disclaimer of Warranties," stated in subsection (b) that the government disclaimed any warranty of fitness of the timber and that

> any warranty as to the quality or quantity of the timber sold hereunder is expressly disclaimed by the Government.

The instructions to bidders that accompanied the bid form contained the identical language in a section captioned "Disclaimer of Warranty."

This disclaimer explicitly and unequivocally stated that the government was not making any warranty about the quantity of recoverable timber. It is difficult to imagine how the disclaimer could have been any clearer. The disclaimer informed the plaintiff that if the plaintiff relied upon the estimates as the basis for calculating its bid, it did so at its own risk. Indeed, by "accept[ing]" the contract, the plaintiff "warrant[ed]" that it did so "on the basis of its examination and inspection of the timber sold under this contract and its opinion of the value thereof."

The present case is significantly different from *McGrew Bros. Sawmill, Inc. v. United States*, Ct.Cl. No. 43–78 (order of July 18, 1980), which the plaintiff describes as "nearly identical" to this case. That, too, was a case in which the plaintiff contended that estimates in a timber-cutting contract were warranties which the government had breached because the estimates grossly overstated the timber actually recoverable. We denied motions for summary judgment and set the case for trial, on the ground that the contract was ambiguous and that extrinsic evidence therefore was necessary to determine its meaning.

The disclaimer provision in *McGrew* merely stated that the "estimated volumes ... are not to be considered as guaranties or limitations of the timber volumes to be designated for cutting under the terms of this contract." It did not use the words "disclaimer" or "warranty." The court held the provision ambiguous because it could be read, as McGrew contended, to indicate only that the estimates were not one hundred percent accurate.

The disclaimer in *McGrew* is in sharp contrast to the disclaimer in the present case. Here the government "expressly disclaimed" "any warranty as to the quantity or quality of timber to be sold." The disclaimer is explicit and unambiguous, and there is no need for extrinsic evidence about its meaning.

In sum, the various documents in this case on their face show that the contract did not make any warranties regarding the quantity of timber to be recovered under the plaintiff's contract. *See Caffall Bros. Forest Products, Inc. v. United States,* Ct.Cl. No. 377-75, 678 F.2d 1071 (decided May 5, 1982), slip op. at 9-11; *Russell & Pugh Lumber Co. v. United States,* 154 Ct.Cl. 122, 290 F.2d 938 (1961).

■ B. The plaintiff argues, however, that even if the estimates were not warranties, nevertheless it may recover if the estimates were negligently prepared or unreasonably inaccurate. The plaintiff does not contend that the government acted in bad faith in making the estimates. The plaintiff urges only that a trial is necessary to determine whether the government was negligent. It relies primarily upon a footnote in *Timber Investors, Inc. v. United States,* 218 Ct.Cl. 408, 415 n.4, 587 F.2d 472, 475-76 n.4 (1978).

In that case, the plaintiff sought to recover expenses it had incurred in building and repairing roads in a national forest in connection with its performance of a timber-cutting contract. The government had agreed to pay the plaintiff the cost of the work, which it estimated at $351,865. The plaintiff sued for the $70,483 by which the actual cost of the work allegedly exceeded the estimate. The trial judge held for the defendant. Neither party excepted to his decision, and on the government's motion, the court adopted the trial judge's recommended decision.

The government had argued that under the contract the plaintiff had agreed to perform the roadwork for $351,865, and therefore could not recover its cost in excess of that amount. In a footnote, the court referred to the government's contention that there were provisions in the contract that "clearly indicated that the estimates were just that and were not to be considered as guarantees of any kind." The court stated that "these provisions, standing alone would not insulate the government from liability if the contract estimates were so grossly erroneous as to indicate a failure to exercise reasonable care and diligence in arriving at said estimates." 218 Ct.Cl. at 415 n.4, 587 F.2d at 475-76 n.4.

■ That statement was dictum and is not binding upon us. *Caffall Bros. Forest Products, Inc. v. United States,* at ——; *McGrew Bros. Sawmill, Inc. v. United States* (Kunzig, J., dissenting). There is no indication in the opinion in *Timber Investors* that the estimates there had the same limitations or conditions as the estimates in the present case or that the contract contained the kind of unambiguous disclaimer here present. The estimates there related to the anticipated costs of road construction and repair work, which may involve different considerations from estimates regarding the amount of recoverable timber. For these reasons, we decline to apply the dubious dictum in *Timber Investors* to the significantly different facts of this case.

■ C. Although the plaintiff's petition also alleged (in count 3) that there was a mutual mistake in the contract because both parties believed that the Bureau's estimates were accurate, the plaintiff has not argued this point in its brief. We therefore deem the contention abandoned. In any event, our discussion of the case indicates that there was no mutual mistake of fact here.

## CONCLUSION

The defendant's motion for summary judgment is granted, and the petition is dismissed.